**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| CHERYL HALL, and BRAD LAFUZE, on behalf of themselves and all others similarly situated, | ) ) ) ) |
| Plaintiffs, | ) Case No. ) |
| vs. | ) ) Hon. |
| WELLPATH LLC, by and through its Chief Clinical Officer and designees, the Responsible Health Authority/Health Services Administrator, and/or its respective Site Medical Directors. | ) ) **CLASS ACTION COMPLAINT** ) ) **DEMAND FOR JURY TRIAL** ) |
| Defendant. | ) |

## CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiffs CHERYL HALL, and BRAD LAFUZE, (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, file this Class Action Complaint and Jury Demand against Defendant WELLPATH LLC ("Defendant"), and state as follows:

### I.    INTRODUCTION

1.    This Class Action Complaint and Jury Demand arises from the systematic and unreasonable interruption, discontinuation, denial, and/or delay of prescribed psychotropic medications to detainees with previously diagnosed, serious mental health care conditions by Wellpath LLC ("Wellpath"), a private, for-profit administrator of prescription medication services and utilization management services to approximately 25 County Jails throughout the State of Michigan.

1

2.     When inmates with serious mental illness enter a correctional facility, delays in continuing treatment with psychotropic medications are likely to result in clinical deterioration, mental health emergencies, and other serious injuries, including death.

3.     Effectively, Wellpath's policy is to cut patients with mental illness off their psychotropic medications first and ask questions later, in violation of clearly established constitutional rights and its common law duties.

4.     In recent years, Wellpath has been at the center of numerous well-publicized tragedies in the State of Michigan involving suicide deaths and suicide attempts by detainees and inmates under its care.

5.     In Grand Traverse County, for example, there has been substantial local activism surrounding Wellpath's deficient provision of prescription psychotropic medication treatments that placed Wellpath on clear notice that its inmates entering with serious mental illness were routinely deprived of their necessary psychotropic medications for unreasonable periods of time, causing serious injuries.

6.     Wellpath policies, practices, and customs with respect to providing psychotropic medications are substantially similar—if not identical—at approximately 25 county jails in the State of Michigan ("County Jail(s)").

7.     Wellpath policies, practices, and customs determine what medications are, and are not, available and administered to detainee-inmates at County Jails.

8.     Wellpath and its designees have total discretion to continue, discontinue, substitute, start, modify, or deny medications and treatments that were prescribed to patients in the community prior to their incarceration.

9.      Wellpath does not require a mental health or psychiatric evaluation by a Qualified Mental Health Professional prior to discontinuation of a community-prescribed, clinically indicated psychotropic medication.

10.     As a matter of policy, practice, and/or custom Wellpath initially refuses to provide prescribed, clinically indicated psychotropic medications to detainees and inmates if their prescriptions are not listed on its formulary.

11.     Refusing to take mental health care seriously, Wellpath uniformly misclassifies psychotropic prescription medications that were clinically indicated by community prescribers as "Routine," instead of "High Priority," thereby denying continuity of care.

12.     Wellpath policies encourage discontinuation of psychotropic medications without first conducting any individualized medical evaluation or mental health evaluation of patients known to suffer from mental illness.

13.     Once denied a prescribed medication, Wellpath fails to adequately notify detainee-inmates regarding its prescription medication denials, the reason for the denials, and fails to provide any process for the detainee-inmates to appeal or request a waiver of Wellpath's denial of known prescription medications.

14.     Wellpath's prescription medication policies, practices, and customs cause widespread and systematic discontinuations and/or denials of prescribed, clinically indicated psychotropic medications to detainees with serious mental health care conditions, leading to substantial injuries and damages to Plaintiffs and the putative class.

15.     Despite knowledge of multiple injuries and crises suffered by patients under their care, Wellpath has refused to make the important, necessary changes to ensure the health, security, and constitutional protection of detainees short of litigation.

16.    Plaintiffs CHERYL HALL and BRAD LAFUZE, on behalf of themselves and a statewide putative class of all others similarly situated, demand compensatory damages and injunctive relief from Wellpath for its egregious, deliberately indifferent conduct in causing the unreasonable interruption, discontinuation, denial, and/or delay of prescribed psychotropic medications and treatments to detainees with previously diagnosed, serious medical conditions at county jails throughout Michigan.

## II.    PARTIES

17.    Plaintiff CHERYL HALL is a citizen of the State of Michigan, and currently resides at the Women's Huron Valley Correctional Facility in Ypsilanti, Michigan, in Washtenaw County.

18.    Plaintiff BRAD LAFUZE is a citizen of the State of Michigan, resident of Kalkaska County, Boardman Township, who was incarcerated as both a pre-trial and convicted detainee at the Grand Traverse County Jail following a guilty plea to a misdemeanor charge in or around June 2019.

19.    Defendant WELLPATH LLC, ("Wellpath") is a Delaware private limited liability corporation, maintaining its principal place of business in the State of Tennessee,  which contracts with County Jails throughout Michigan to perform the traditional governmental function of administering health care services, including prescription drug services, to pre-trial detainees and post-conviction inmates at approximately 25 County Jails throughout Michigan and hundreds more throughout the United States.

20.    At all relevant times hereto, Wellpath acted under color of state law and pursuant to its own policies, practices and customs, which were the driving force behind the constitutional violations asserted herein.

## III.    JURISDICTION AND VENUE

21.     This Court has original jurisdiction over the claims that arise under the Fifth/Fourteenth, and Eighth Amendments to the United States Constitution and brought pursuant to 28 U.S.C. §§ 1983 and 1988.

22.     This Court has supplemental jurisdiction over the state law claims Pursuant to 28 U.S.C. § 1367 because they are so related to the claims over which this Court has original jurisdiction that they form part of the same case or controversy, and the state law claims do not substantially predominate the federal claims.

23.     This Court has diversity jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1332 because all Plaintiffs and all Defendants are citizens of different states and the amount in controversy well exceeds $75,000.

24.     This Court has personal jurisdiction over Defendant because Defendant engages in substantial business in this District, including contracting with local County Jails in this District to provide prescription medication administration and utilization management services.

25.     Venue is proper in this Court under 28 U.S.C. 1391(b)(2) because a substantial portion of the events or omissions giving rise to Plaintiffs' claims took place in this District.

26.     The vast majority of inmates in County Jails previously injured by and/or currently subject to the Wellpath policies that are at issue in this action are/were incarcerated in this District, and Plaintiff Cheryl Hall is currently incarcerated in this District.

### IV.     GENERAL AND FACTUAL ALLEGATIONS

27.     It is well-established under federal constitutional law that neglecting a prisoner's known medical needs and interrupting a prescribed plan of treatment, even for a relatively short period of time, can constitute a constitutional violation.

28.     Under Michigan Law, county jails are required to establish and maintain written policies, procedures, and practices for conducting a mental health screening on each new detainee upon intake into the jail.

29.     The results of mental health screenings are to be recorded on a form approved by the facility's designated health authority and promptly communicated to the designated health authority.

30.     Initial health screenings must record the results of an inquiry into, *inter alia*, the detainee's current health problems, mental health problems, use of drugs (including by drug type, amount used, frequency of use, date or time of last use, and any history of problems from ceasing use), past and present treatment for mental disturbance or suicide, and other health problems.

31.     County jails must make and record a medical disposition of each patient based on the initial mental health screening for: (i) general population; (ii) general population with prompt referral to appropriate health care service; or (iii) referral to appropriate health care service for emergency treatment.

32.     Under Michigan Law, county jails are also required to establish and maintain written policies, procedures, and practices requiring a comprehensive health appraisal for each detainee within 14 days after arrival at the jail, which involves diagnostic testing, collection of medical and mental health histories, taking vitals, a medical and mental health examination, and the initiation and/or development of medically appropriate treatment plans.

33.     Upon information and belief, at least the following Michigan Counties have, or within the statute of limitations had, a contract with Wellpath to provide medical services, including mental health care, prescription medication, and utilization management administration:

    i.    Alger County
   ii.    Allegan County

6

    iii.     Arenac County
    iv.     Bay County
    v.     Berrien County
    vi.     Chippewa County
    vii.     Clare County
    viii.     Delta County
    ix.     Dickinson County
    x.     Gogebic County
    xi.     Grand Traverse County
    xii.     Isabella County
    xiii.     Lenawee County
    xiv.     Mackinac County
    xv.     Macomb County
    xvi.     Marquette County
    xvii.     Muskegon County
    xviii.     Newaygo County
    xix.     Oakland County
    xx.     Ogemaw County
    xxi.     Ottawa County
    xxii.     Schoolcraft County
    xxiii.     Tuscola County
    xxiv.     Washtenaw County
    xxv.     Wayne County

34.    The three most populous County Jails with which Wellpath contracts are Wayne County (approximately 2,866 inmates), Oakland County (approximately 1,520 inmates), and Macomb County (approximately 1,400 inmates).[1]

35.    Other than Wayne, Oakland, and Macomb Counties, no other County Jail listed has an inmate population of 1,000 or more.

36.    The vast majority of detainees and inmates currently and previously affected by Wellpath's prescription medication and mental health care administration policies and practices were incarcerated in the southernmost counties that are located in the jurisdictional territory of the Eastern District of Michigan.

---

[1] Grand Traverse County Jail, by contrast, has approximately 142 inmates.

37.      Wellpath acts as the designated health authority for administering prescription medications, mental health screenings and evaluations, utilization management services, and other health care services for each of the Counties with which it maintains a contract.

38.      As the designated health authority, Wellpath is responsible through Michigan Law and contract for establishing, maintaining and executing policies, procedures, and practices for administration of prescription medications, mental health screening and evaluation, utilization management, and other health care services.

39.      Through its contracts, Wellpath has the same legal duties as the County Jails and the County Sheriffs under common law, statute, and constitutional law.

40.      Wellpath accordingly acts under color of state law by carrying out a traditional state function of providing medical administrative services in a county jail.

### *Wellpath's Standardized Statewide Policies, Procedures, and Practices*

41.      Wellpath is the largest for-profit correctional care health care company in the United States, with a presence in more than 500 jails and prisons nationwide.

42.      Wellpath previously conducted business under the name Correct Care Solutions ("CCS") prior to its acquisition by an affiliate of private equity giant H.I.G. Capital, which combined CCS with its existing correctional care company, Correctional Medical Group Companies ("CMGC").

43.      Wellpath utilizes standardized, substantially identical company policies that are developed through its corporate employees and used in all County Jails with which it maintains a contract in the State of Michigan.

44.     Wellpath written policies and procedures with respect to prescription medications, and specifically psychotropic medications, are formulated and established by Wellpath's corporate employees.

45.     Wellpath's standardized prescription drug policies and procedures are substantially similar—if not identical—at all county jails it contracts with in Michigan.

46.     Wellpath's standardized mental health screening and evaluation policies are substantially similar—if not identical—at all County Jails with which it contracts in Michigan.

47.     Wellpath's formulary is substantially similar—if not identical—at all County Jails it contracts with in Michigan.

48.     Wellpath's High Priority Medication List is substantially similar—if not identical—at all County Jails it contracts with in Michigan.

49.     Wellpath employees or contractors at County Jails in Michigan know about, and follow, Wellpath's policies when coordinating care to inmates in a county jail, including for mental health screenings and evaluations, prescription drug determinations, verifications, and administration of medications.

50.     Wellpath policies and procedures are the driving force behind all determinations regarding whether, and when, a detainee/inmate patient is permitted to continue a previously prescribed medication upon incarceration.

51.     Decisions about whether to start, continue, or deny a certain psychotropic medication are made pursuant to established corporate policies, which are implemented by Wellpath's designated Site Medical Directors at each County Jail.

52.     Any site-specific procedures at County Jails with respect to the initiation of prescription medications must be submitted to and approved by Wellpath's Regional Director of Operations and Wellpath Corporate Operations.

53.     Wellpath expressly disclaims in its contacts with County Jails that it is not a licensed medical provider or professional; Rather, Wellpath provides administrative services to correctional institutions, such as "Utilization Management services" and contracts with licensed professionals who provide medical services under Wellpath's administrative supervision and pursuant to its policies.

54.     Concerns regarding the adequacy of Wellpath's administration of care for custodial patients, specifically with respect to prescription medications and treatment of inmates with serious mental health conditions, has been the subject of numerous scathing media reports.

55.     In Grand Traverse County, for example, over 1,000 people have liked and followed a Facebook Page entitled "Grand Traverse County Jail Abuse," which is a platform for discussion and sharing of information relating to detainee treatment.

### *Wellpath's Contracts with County Jails*

56.     Under its contracts with the Counties, Wellpath is responsible for administering correctional health care services, mental health care services, utilization management services, pharmacy services, and related administrative services at the Jail.

57.     Pursuant to the agreements, Wellpath is responsible for arranging and, at least initially, bearing the costs of psychotropic and mental health medications for detainees at the County Jails.

58.     Wellpath is responsible for developing and implementing policies and practices to coordinate, prescribe, dispense, and administer all prescription drug services in the Jail.

59.     Wellpath is responsible for reviewing initial health screenings, conducting statutorily mandated health appraisals/assessments, including a mental health assessment, and initiating appropriate therapy, including making referrals for mental health treatment.

60.     Decisions to start new psychotropic medications are made by Wellpath's Qualified Mental Health Professionals, typically by referral from a Wellpath contractor/employee.

61.     Through its contracts with the County Jails, "it is understood that Wellpath is not licensed or otherwise authorized to engage in any activity that may be construed or deemed to constitute the practice of medicine, dentistry, optometry, or other professional health care service requiring licensure or other authorization under state law."

62.     The contracts include a Wellpath staffing matrix that designates the number of hours for each Wellpath contractor/employee to provide services in the jail, including for the Site Medical Director, a Psychiatrist, and/or a Psychiatric Nurse.

63.     In Grand Traverse County, for example, Wellpath's staffing matrix indicates that for an assumed inmate population of 160, the Site Medical Director will work only one hour per week, on Mondays, and the Wellpath Psychologist will work only two hours per week, on Tuesdays.

64.     Wellpath grossly understaffs the County Jails in Michigan with Qualified Mental Health Professionals whose authority may be necessary to establish continuity of care with respect to psychotropic medications.

65.     The implementation of Wellpath Policies, Practices, and Customs at each County Jail is delegated to its Site Medical Director.

66.     All decisions to discontinue, deny, or refuse to start a medication are made initially by Wellpath's Responsible Physician and Site Medical Directors pursuant to company policies.

*Serious Mental Health Conditions and Psychotropic Medications in Michigan County Jails*

67.     The County Jails that contract with Wellpath in the State of Michigan have a continuous inmate population of over 9,000.

68.     Because of the relatively short terms of incarceration in County Jails, the total number of inmates that fall under Wellpath's administration of health care services is much higher.

69.     The use of psychotropic medications to treat serious mental health conditions is a widespread problem in the custodial setting that requires administrative policies, procedures, and practices to ensure continuity of care for incoming inmate-detainees until such time as a qualified professional can conduct an adequate mental health evaluation to determine the clinical necessity of continuing a prescribed medication in a custodial setting.

70.     According to a 2006 study by the United States Department of Justice, 64% of inmates in local jails suffer from a mental health problem, which included both a diagnosed recent history and symptoms of mental illness.

71.     In the same study, 21% of jail inmates have a recent history of mental health problems, which included clinical diagnoses and treatment by a mental health professional.

72.     In the same study, 14.4% of local jail inmates used prescription medications to treat diagnosed mental illness.

73.     Accordingly, the number of detainee-inmates in Michigan County Jails who enter the custodial setting in Michigan with prescribed medications to treat serious mental health conditions, and who are under Wellpath's administration of care, is likely well in excess of 1,000 individuals every year.

74.     Due to the custodial setting, local jail detainees and inmates do not have the agency to obtain and provide for their own prescription medications during their incarceration, and agents

of the County Jail and their contractors, including Wellpath, have a duty to establish and maintain policies that reasonably ensure continuity of care for detainees in their custody.

75.     Nor do most County Jail inmates have the type of family and community support to provide outside advocacy for continuing their psychotropic medications once Wellpath denies continued treatment.

76.     Continuity of care with prescribed psychotropic medications is particularly important because of the injuries that can occur within a very short period time following incarceration.

77.     According to a 2016 United States Department of Justice Study, county jail inmates nationwide who died while incarcerated served a median of 19 days prior to their death.  Suicide accounted for 31% of such jail inmate deaths.

78.     40% of inmate deaths reported between 2000 and 2014 occurred within the first 7 days of admission.

79.     It is widely recognized and understood in the correctional health care setting that delays in continuing treatment with psychotropic medications for inmates with serious mental illness who enter a correctional facility may suffer clinical deterioration, a mental health emergency, or other serious injuries.

80.     Wellpath knows that failures to provide continuity of care with respect to psychotropic medications creates an unreasonable risk of serious bodily harm; the company agreed to pay a $4.5 million settlement following an August 2014 inmate death in a Colorado county jail that was caused by "acute benzodiazepine withdrawal."

*Plaintiff Cheryl Hall*

**81.**    Plaintiff Cheryl Hall lost one of her sons as a result of opioid addition and struggled financially during his addiction, rehabilitation, and ultimately his death.

**82.**    Ms. Hall suffers from five serious medical conditions, including high blood pressure, major depression, severe anxiety, asthma, and insomnia.

**83.**    Ms. Hall's major depression and severe anxiety are serious mental health conditions.

**84.**    Ms. Hall was clinically diagnosed with these conditions prior to her incarceration at the Grand Traverse County Jail, which is among the County Jails that contracts with Wellpath.

**85.**    Ms. Hall's prescription medications to treat her serious medical conditions included Losartan (high blood pressure), Xanax (anxiety), Prozac (depression), Spiriva inhaler (asthma), Ventolin inhaler (asthma), and Ambien (insomnia).

**86.**    Ms. Hall's primary care physician determined that these medications are critical to her physical and psychiatric health.

**87.**    Ms. Hall's high blood pressure condition is exacerbated during episodes of depression and high anxiety.

**88.**    Ms. Hall's major depression and severe anxiety were clinically diagnosed and treated through both inpatient and outpatient visits, including a ten-day outpatient program prior to her initial incarceration at the Jail.

**89.**    In early 2019, Ms. Hall was aware that there was a warrant out for her arrest related to charges of embezzlement.

**90.**    Prior to her arrest, Ms. Hall made an unsuccessful attempt at suicide, which she reported upon intake in the County Jail during her mental health screening.

**91.** Her son, Greg Hall, concerned for her safety, reported her location to a detective with the Michigan State Police so that she could be arrested and detained.

**92.** Ms. Hall was incarcerated in the County Jail on the afternoon of February 2, 2019 as a pre-trial detainee.

**93.** Upon intake, a County Corrections Officer conducted a Medical/Mental Questionnaire with Ms. Hall.

**94.** Ms. Hall reported that she had six prescription medications to treat her diagnosed medical conditions.

**95.** The intake questionnaire recorded each of these prescribed medications and each of her diagnosed medical conditions: high blood pressure, depression, anxiety, and asthma.[2]

**96.** Ms. Hall further reported that she attempted suicide very recently.

**97.** Ms. Hall indicated that she was feeling depressed and reported symptoms of depression at the time of her intake.

**98.** The intake officer recorded that Ms. Hall appeared depressed.

**99.** Ms. Hall's incarceration records included a suicide note to her family signed by Ms. Hall.

**100.** Ms. Hall was placed in the general population with a prompt referral for appropriate health care service.

**101.** A Mental Health Service Request for Ms. Hall was marked "URGENT" because of her active suicide attempt and reports of current depression symptoms.

**102.** On February 2, 2019, Ms. Hall's son Greg Hall personally delivered all of her prescription medications to the Jail.

---

[2] The questionnaire did not list insomnia.

103.    Mr. Hall personally handed each of his mother's prescription medications to a Wellpath nurse in the presence of a County Corrections Officer.

104.    The Wellpath nurse promised Mr. Hall that his mother would receive her prescribed medications.

105.    During her period of incarceration, Wellpath failed to provide Ms. Hall with any of her prescription medications.

106.    Wellpath failed to provide Ms. Hall with a reason, medical or otherwise, for failing to provide her medications.

107.    Even though a Mental Health Service Request was filled out by the corrections staff and her intake at minimum justified a "prompt referral to appropriate health care service," Ms. Hall received no medical examinations or mental health evaluations during her period of incarceration.

108.    Ms. Hall received no individualized mental health appraisal or evaluation prior to the denial of her prescription medications.

109.    Despite knowledge of her prescribed psychotropic medications, and medication to treat a serious blood pressure condition, Wellpath failed to administer any of Ms. Hall's medications.

110.    Wellpath failed to substitute any of Ms. Hall's prescribed medications with alternative medications to treat her serious mental health conditions.

111.    On February 4, 2019, Ms. Hall reported to a corrections officer that she did not feel well.

112.    The corrections officer later recorded that Ms. Hall presented as unsteady on her feet and that she needed physical assistance to ambulate safely.

113.    Ms. Hall reported that she had not received or taken any of her prescribed medications.

114.    Ms. Hall's vitals indicated a blood pressure of 204/123 and a heart rate of 97, and she was suffering from a hypertensive crisis.

115.    Ms. Hall was transported on an emergency basis to the Munson Medical Center hospital because of her elevated blood pressure.

116.    Upon admission at the hospital, the Munson Medical Center doctor, Dr. Snyder, expressed serious concern that Ms. Hall was denied her prescribed medications during her period of incarceration.

117.    Ms. Hall's hypertensive crisis was life-threatening.

118.    Ms. Hall was released from Munson Medical Center into an inpatient mental health center.

119.    Ms. Hall suffered physical injuries, psychological trauma, severe anxiety, severe depression, and clinical decompensation as a direct and proximate result of Wellpath's actions pursuant to their policies, customs, and practices that caused the denial of her necessary prescription medications during her incarceration, including her psychotropic medications.

120.    At all times relevant to Ms. Hall's detainment, Wellpath staff acted pursuant to the company's established policies, practices, and customs.

121.    Following the injuries Ms. Hall sustained, Greg Hall—who was her power of attorney—filed formal complaints to the County Jail on her behalf regarding the failure to administer her necessary medications, as instructed.

122.    Mr. Hall emailed the Jail Administrator and Sheriff documenting his concerns, as instructed.

123.    The County Jail previously admitted to Mr. Hall that his mother never received her prescribed medications.

124.    During Mr. Hall's investigation into his concerns regarding the denial of necessary prescription medications, a Wellpath nurse named Tasha stated that there is often very little coordination between jail staff and the medical team and that inmates are sometimes in jail for over 12 or 24 hours before any review of their intake or mental health screening.

125.    Wellpath nurse Amy Booms also informed Mr. Hall that "Narcotics and Benzodiazepines are not medications we give at the jail."

126.    Ms. Booms cited the "formulary" as the reason for not permitting narcotic and benzodiazepine medications at the Jail, and she recommended that Ms. Hall take the independent initiative to "wean" herself off Benzodiazepines prior to her scheduled return to the Jail for sentencing.

127.    Wellpath refused to provide Ms. Hall with her prescription Xanax without first conducting any mental health appraisal, even though Benzodiazepine withdrawal is widely known to cause serious physical harm.

128.    Wellpath knows that withdrawal from benzodiazepines can cause serious physical injury as evidenced by the company's agreement to pay a $4.5 million settlement following an August 2014 inmate death in a Colorado county jail that was caused by "acute benzodiazepine withdrawal."

129.    On June 24, 2019, Ms. Hall returned to the Jail for her pre-scheduled sentencing.

130.    Because she knew that she would be returning, Ms. Hall, with advocacy support from her son, obtained a June 20, 2019 doctor's note that specifically stated that Ms. Hall "is on prescription medications for her major depression and severe anxiety and will need to continue

these medications as prescribed or she will be at high risk for medical and psychiatric decompensation to her health."

131.    The letter also included her diagnostic history, including notification of recurrent major depression disorder, anxiety, suicide attempt, adjustment disorder, disappearance and death of family member, and essential hypertension, among others.

132.    Ms. Hall provided this doctor's note to the County Jail, as instructed.

133.    Upon readmission into the Jail, despite pre-ordering current medications and providing a note regarding their medical necessity, Wellpath again refused to administer several of her medications.

134.    Wellpath's Site Medical Director, Dr. Ann Kuenker, refused to administer her prescription drugs for treatment of her anxiety and depression.

135.    Wellpath staff demanded that Ms. Hall call her personal doctor to get prescriptions for substitute medications to treat her anxiety and depression, so that they could be charged to her personal health insurance to avoid costs to Wellpath.

136.    Ms. Hall complained regarding the denial of her depression and anxiety medications and called her son to inform her that she was once again being denied some of her prescription medications.

137.    Ms. Hall also called her personal physician to get new prescriptions for alternative drugs to replace the prescriptions that Dr. Kuenker discontinued and/or denied.

138.    Wellpath, through Dr. Kuenker, failed to verify Ms. Hall's substitute medication for depression, Trazodone, and it was therefore never administered.

139.    Wellpath once again failed to administer Ms. Hall's prescription for Xanax.

140.     On June 25, Mr. Hall—as his mother's advocate—was required to take matters into his own hands; He travelled to the pharmacy to pick up his mother's newly ordered substitute medications because of Wellpath's denials.

141.     By the time he arrived with the substitute medications, Ms. Hall had already been sentenced and transferred to the Women's Huron Valley Correctional Facility, where she received her necessary prescription medications.

142.     Because of Wellpath's policies, practices, and customs, Ms. Hall was denied known, medically necessary prescription medications during her incarceration, causing substantial injuries and damages.

### *Plaintiff Brad Lafuze*

143.     Brad Lafuze is an Iraq War veteran who served two tours of duty in service of the United States Armed Forces.

144.     In 2009, he was struck with an Improvised Explosive Device (IED) and developed a number of serious mental health conditions resulting from his deployment in the United States Armed Forces.

145.     Mr. Lafuze has long struggled with addiction and alcoholism.

146.     Prior to his incarceration at the Jail, and following his military service, Mr. Lafuze was diagnosed with Post-Traumatic Stress Disorder (PTSD), severe anxiety, severe depression, and epilepsy.

147.     Mr. Lafuze was prescribed with the following medications to treat his serious medical conditions: Seroquel (PTSD); Hydroxyzine (Anxiety); Prazosin (PTSD/Nightmares); Prozac (Depression); Carbamazepine (Seizure Disorder/Mood Stabilizer).

**148.**    Each of these medications are critical to his physical and psychiatric health and based on prior diagnosis and treatment plan prescribed by qualified physicians.

**149.**    Following his deployment, Mr. Lafuze attempted suicide because of his severe and ongoing depression and anxiety.

**150.**    Mr. Lafuze was treated and diagnosed with PTSD, anxiety, and depression in a psyche ward following his deployment.

**151.**    His medication regimen allows him to remain functional and steady through the day and supported his efforts to avoid self-harm and harm to others.

**152.**    When Mr. Lafuze is deprived of his medication, which is clinically indicated by his personal physician, his moods spiral out of control and it causes severe physical manifestations that create a danger to himself and those around him.

**153.**    Deprivation of Mr. Lafuze's medications also causes him to suffer from severe symptoms relating to withdrawal.

**154.**    Mr. Lafuze was incarcerated at the Grand Traverse County Jail following a guilty plea to misdemeanor charges.

**155.**    Mr. Lafuze was in a car accident while driving a vehicle with his father-in-law as a passenger.

**156.**    Their vehicle was hit head-on by a semi-truck.

**157.**    Mr. Lafuze suffered moderate injuries from the accident, but his father-in-law died from the injuries sustained.

**158.**    Mr. Lafuze was sentenced to 60 days in County Jail as a result of a misdemeanor guilty plea.

159.    Mr. Lafuze reported his serious mental health care conditions to the County Jail upon intake.

160.    Mr. Lafuze reported each of his prescribed psychotropic medications to the County Jail upon intake.

161.    The intake officer orally noted to Mr. Lafuze that he was on "a lot of meds."

162.    Mr. Lafuze's wife personally delivered his prescription medications to the County Jail on the day he was incarcerated.

163.    Wellpath received those prescription medications and knew about Mr. Lafuze's medical and mental health conditions and prescriptions.

164.    Mr. Lafuze informed the County Jail and Wellpath that he suffers from severe side effects and withdrawal symptoms when he does not take his prescription medications.

165.    On his first night of incarceration, Mr. Lafuze received Carbamazepine for seizures but was denied all of his other prescription medications by Wellpath—decisions which are ultimately made by Wellpath's Site Medical Director, Dr. Ann Kuenker pursuant to corporate policy.

166.    Mr. Lafuze visited a Wellpath nurse the day after he was incarcerated, and he informed her about his need for his prescribed psychotropic medications.

167.    The nurse told him that he would have to visit the "psyche nurse" first in order to receive those prescriptions.

168.    The nurse refused to address any of his concerns regarding his regular medications, providing him only with a 3-day order for Ibuprofen to treat pain from the car accident.

169.    The Wellpath nurse instructed Mr. Lafuze that he needed to file a "Kite" as a precondition to visiting the psyche nurse.

22

170.    Mr. Lafuze filed a Kite requesting a visit with the "psyche nurse" so he could get his prescribed medications.

171.    In response to Mr. Lafuze's Kite, he was instructed that he would be put on a list to see the psyche nurse but that it would be approximately three weeks before he could receive a mental health evaluation from the psyche nurse.

172.    Days into his incarceration, Mr. Lafuze saw who he believed to be a Wellpath-contracted medical professional, and he informed her about his continuing need for his psychotropic prescription medications.

173.    Mr. Lafuze informed the Wellpath provider that he was suffering severe depression, anxiety, and mood destabilization because he was taken off his medications.

174.    This Wellpath provider told Mr. Lafuze that he was going to have to "wait" to receive any of his prescription medications, and she claimed that she could not do anything for him.

175.    The Wellpath medical provider only treated Mr. Lafuze for the physical injuries he sustained in the car accident—ignoring his known mental health conditions and prescribed psychotropic medication treatments.

176.    The Wellpath provider offered him only a prescription for an arthritis medication as a replacement to the previously administered Ibuprofen, to help with the pain from the car accident.

177.    Wellpath never informed Mr. Lafuze that his medications were being denied or discontinued.

178.    Wellpath never provided a reason for denying or discontinuing Mr. Lafuze's medications.

179.     Wellpath never provided Mr. Lafuze with information regarding his right to challenge the denial or discontinuation of his prescription drug treatment.

180.     Because Wellpath deprived him of his medications while incarcerated, Mr. Lafuze suffered from regular, severe panic attacks and physically manifested traumatic episodes over the course of more than a week of incarceration.

181.     Mr. Lafuze was "going crazy" every day without his prescription medications, and his mood was severely destabilized.

182.     Mr. Lafuze was plagued by thoughts of suicide and self-harm while being deprived of his prescription medications.

183.     Mr. Lafuze frequently had to lie in bed holding a blanket tightly over his head in order to block out the noise and inner demons that plagued him during his ongoing clinical decompensation and crisis.

184.     Loud noises and other auditory triggers in the Jail caused haunting memories and wild mood swings in connection with his unmedicated PTSD.

185.     Mr. Lafuze's moods swung wildly, causing physical manifestations, including manic laughing and sudden crying.

186.     Mr. Lafuze complained to staff regarding his injuries, including panic attacks and withdrawal symptoms.

187.     Mr. Lafuze spoke with his wife every day that he was incarcerated and expressed the agony that he was suffering without his medications.

188.     A Corrections Officer made fun of Mr. Lafuze for reporting his crisis, stating, "what's the difference between tonight and any other night" when he reported that he was "going crazy."

189.     Mr. Lafuze was helpless, forced to wait and suffer through an ongoing, preventable mental health care crisis without his medications and without any other options for obtaining his medications or challenging the deprivation.

190.     Suddenly and without explanation, more than one week into his term of incarceration, Mr. Lafuze was instructed to report to Wellpath, where he was asked to sign medical treatment waiver forms so that she could get his medications from the Veterans Affairs (VA).

191.     Following more than a week of interrupted and discontinued care for Mr. Lafuze's known medical conditions, Wellpath, without any intervening medical or psychological evaluation, restarted all of his psychotropic treatments, as previously ordered by his community physician.

192.     Mr. Lafuze was never given a medical reason regarding why his care had been denied or discontinued, and he was never provided a medical reason explaining why he was suddenly provided with the medications without any intervening examination or evaluation by Wellpath staff or a qualified mental health care professional.

193.     At one point during his incarceration and after his medications were restarted, Mr. Lafuze stopped at the nurses' station to receive his medications, and a Wellpath nurse asked him whether he was related to Greg Hall, the son of Plaintiff Cheryl Hall who made complaints regarding Wellpath's treatment.

194.     Mr. Lafuze told the Wellpath nurse that he was related to Greg Hall through marriage, and the Wellpath nurse answered, "well, tell him just to stop."

195.     Mr. Lafuze later learned that his sister had been regularly calling into the Jail to complain that he needed his prescription medications.

196.    Mr. Lafuze also later learned that his brother-in-law Greg Hall was leading a growing group of local citizens seeking answers regarding Wellpath's deficient prescription drug policies and practices.

197.    Mr. Lafuze believes that his sister's protestations and outside efforts to help him were the only reason that Wellpath suddenly broke with their policy of discontinuity of care and began providing his medications without any intervening mental health care evaluation.

198.    Wellpath never provided Mr. Lafuze with a visit to the "psyche nurse" or any other mental health care professional during his term of incarceration.

199.    The denial and discontinuation of Mr. Lafuze's established prescription medication regimen was caused by Wellpath's policies relating to prescription medications and mental health evaluations, and there was no medical or penological basis for the discontinuity of his care.

200.    There was also no medical or penological basis for suddenly restarting his prescription care, as he received no mental health evaluation.

201.    Mr. Lafuze suffered substantial physical injuries that were akin to torture, psychological trauma, clinical decompensation, pain and suffering, and emotional distress as a result of Defendant's policies depriving him of his necessary prescription medications.

202.    Mr. Lafuze is not currently incarcerated.

203.    Mr. Lafuze has been incarcerated in County Jails in Michigan on multiple occasions.

204.    Mr. Lafuze has been convicted for other criminal offenses while residing in other states.

205.    Because Mr. Lafuze is a multiple offender with a number of serious mental health conditions and alcoholism, there is a reasonable expectation that he will once again be incarcerated

in a Michigan County Jail and once again subject to Defendant's policies, practices, and customs with respect to the administration of prescription drugs.

### Wellpath's Drug Classifications Cause Intentional Discontinuity of Prescription Drug Treatments to Inmates with Serious Medical Conditions

206. Wellpath policies, customs, and practices are the driving force behind determinations regarding all decisions to continue, discontinue, substitute, start, modify, or deny psychotropic medications and treatments that were prescribed to detainees at the Jail prior to their incarceration.

207. Wellpath's designated Site Medical Directors make all initial determinations pursuant to company policies, which are established and interpreted by Wellpath.

208. Wellpath maintains a list of "High Priority Medications."

209. Medications not listed on Wellpath's list of "High Priority Medications" are considered by Wellpath as "Routine Medication."

210. Wellpath's policy with respect to "High Priority Medications" is to ensure that they are administered by the next scheduled dose, with no discontinuity of care.

211. "Routine Medications," on the other hand, are only "attempted to be verified" by Wellpath staff.

212. "Routine Medications" are only administered "when ordered by a Wellpath prescriber or authorized prescriber."

213. "Routine" medications are systematically discontinued or denied without consideration for the clinical necessity of the medication with respect to each patient and the underlying medical facts.

214. Wellpath policies do not require a mental health or psychiatric evaluation prior to discontinuing "routine" medications.

215.     Wellpath's intentional denial of "Routine" medications at County Jails is uniquely flagrant with respect to psychotropic medications, which it fails to recognize as "High Priority" despite numerous incidents of serious trauma, injury, and death which have been caused by the deprivation of mental health care prescriptions from its patients.

216.     Wellpath's discontinuation or denials of "routine" mental health care prescription treatments are made without first conducting any individualized mental health or psychiatric evaluation of the patient's medical needs.

217.     Wellpath's policies have intentionally caused the systematic denial of detainees' constitutional right to receive prescribed medications, mostly as a means to cut costs and protect their lucrative contracts with county jails.

***Wellpath's Medication Verification Policy Causes Intentional Discontinuity of Mental Health Care***

218.     Wellpath's Medication Verification Policy Denies Continuity of Care.

219.     Wellpath utilizes a "Medication Verification" policy before its decision to continue, substitute, or discontinue active prescriptions of detainees.

220.     Under the Medication Verification Policy, the option to decline or discontinue a detainee's active prescription should be invoked "whenever a medication is thought to be unnecessary or inappropriate based upon diagnosis, usage, drug type, drug indication, dosage, etc."

221.     However, Wellpath policies do not require any individualized mental health or psychiatric evaluation of each detainee-patient by a Qualified Mental Health Professional prior to initiating the Medication Verification process.

222.     Wellpath policies do not require an individualized mental health or psychiatric evaluation of a detainee by a Qualified Mental Health Professional prior to its ultimate determination to discontinue or deny a reported, prescribed medication to detainees under its care.

223.     Medication verification logs are utilized by Wellpath to document the Medication Verification process, including whether a medication was approved or denied.

224.     If Wellpath is unable to verify a reported medication that is not self-classified as "High-Priority," it is not provided to detainees as a continuing medication and thereby discontinued.

225.     Wellpath's Medication Verification Policy provides that, even when a medication is verified, the prescription should be discontinued if it is "not current or was never provided" and "the patient is generally considered as not currently receiving treatment with the identified medication."

226.     Further, if a prescription medication is not current, it is discontinued, irrespective of how recently the medication expired, the patient's history with the medication, or whether an individualized mental health assessment or mental health or psychiatric evaluation has occurred.

227.     Once discontinued by Wellpath, no psychotropic medications will be started without an order from a Wellpath Qualified Mental Health Professional, which leads to denial of medications or substantial and unreasonable discontinuity of care.

228.     By discontinuing an existing prescription, Wellpath forces inmate-detainees into a bureaucratic boondoggle of delay; it can up to a month to actually receive an evaluation from a Qualified Mental Health Professional who can start a new prescription medication based on a prior diagnosis.

229.     Through the Medication Verification policy, including Wellpath's practices and customs thereunder, Wellpath systematically and intentionally discontinues and/or denies reported, active psychotropic drug treatments for detainees with serious mental health conditions

for non-medical reasons, causing discontinuity of care, unreasonable delay and/or denial of medications to patients under its care.

### *The Wellpath Formulary Causes Intentional Discontinuity of Mental Health Care*

230.    A formulary is an official list giving details of medicines that may be prescribed.

231.    Wellpath maintains a formulary, which its agents and/or contractors, including Site Medical Directors, rely upon to determine whether to continue an existing prescription medication or start a prescription medication for a detainee under Wellpath's care.

232.    Wellpath's formulary administration and management is part of the "utilization management" service it provides to County Jails.

233.    Wellpath does not initially approve psychotropic medications to detainees that are not listed on its formulary.

234.    Wellpath policies do not require an individualized mental health assessment or a mental health or psychiatric evaluation of a detainee by a Qualified Mental Health Professional prior to its formulary-based determinations to discontinue, or deny a reported, prescribed psychotropic medication.

235.    When a non-formulary psychotropic medication is clinically indicated, Wellpath policies do not require, instruct, or encourage Site Medical Directors at County Jails to identify an appropriate substitute medication that is on the Wellpath formulary, or, alternatively, to advocate for administration of the medication in order to prevent discontinuity of care.

236.    Wellpath policies do not instruct or encourage Site Medical Directors to continue non-formulary psychotropic medications prescribed in the community until the prescription can be reviewed by a Qualified Mental Health Professional.

237.     As a matter of policy, practice, and/or custom, Wellpath and its agents fail to notify detainees at the Jail regarding any process or procedure for obtaining a waiver to receive a non-formulary medication, causing a de facto denial of their prescribed medical treatment for non-medical reasons.

238.     Wellpath systematically fails to communicate its decisions and/or the underlying reasons for discontinuing and/or denying prescription drug treatments to patients under its care.

239.     Wellpath systematically fails to notify patients who are denied a prescription medication that there is an adequate appeal or formulary waiver process through which to challenge Wellpath's discontinuation of their prescribed treatments.

240.     Wellpath's policies refuse patients an opportunity to be heard regarding Wellpath's denial of a prescription medication that was not on its formulary, either before or after the discontinuation of care.

### *Wellpath Policies and Practices Do Not Require a Mental Health or Psychiatric Evaluation with a Qualified Mental Health Professional within the First Month of Incarceration*

241.     Upon intake in County Jails, either correctional staff or Wellpath are required to conduct an initial health and mental health screening.

242.     If conducted by correctional staff, Wellpath is under a duty ensure that their medical staff reviews intake screenings.

243.     Initial intake screenings require inquiry and documentation of, *inter alia*, mental health problems, types of medications/drugs used, mode of use, amounts used, frequency used, date or time of last use, past and present treatment or hospitalization for mental disturbance or suicide, and current behaviors.

244.     Under Wellpath policies, a Qualified Health Care Professional must conduct an "Initial Health Assessment" within 14 days of intake into the County Jail.

245.    Psychotropic medications cannot be started under Wellpath policies until inmate-detainees are evaluated by a Qualified Mental Health Care Professional.

246.    Wellpath policies do not require that a Qualified Mental Health Professional be present and participate in the Initial Health Assessment.

247.    During this Initial Health Assessment, Wellpath policies require only a "follow up" to the initial mental health screening information taken upon intake.

248.    The Health Assessment fails to include a "Mental Health Evaluation" or Psychiatric Evaluation, even for patients who reported serious mental health condition(s) and a corresponding psychotropic medication upon intake.

249.    The "follow up" Mental Health Assessment is essentially duplicative of the initial mental health screening taken upon intake, covering substantially the same information as already reported and reviewed.

250.    Wellpath policies state that mental health "[r]esponses of a positive or concerning nature will result in a referral to mental health staff for additional assessment."

251.    Wellpath calls this "additional assessment," upon referral by a Qualified Health Professional, a "Mental Health Evaluation" or a "Psychiatric Evaluation."

252.    However, Mental Health Evaluations are only required to be performed "within 30 days of the positive screen," meaning that an inmate-detainee has to wait not only to be seen by a Medical Health Professional, but also that they must wait an additional 7-14 days after that before receiving an opportunity to start the psychotropic medication for which they should have been receiving for weeks.

253.    Accordingly, inmate-detainees with serious mental health conditions whose psychotropic medications were discontinued pursuant to Wellpath policies must wait weeks to

receive an adequate mental health evaluation, even though Wellpath knew about their underlying conditions and prescribed medications from the first day of incarceration.

254. Inmates deprived of their prescribed psychotropic medications by the lengthy delays caused by Wellpath's mental health care screening and referral policies suffered damages including physical injury, psychological trauma, clinical deterioration, withdrawal symptoms, mental health emergencies, physical manifestations of their condition, and other serious injuries.

### Wellpath Systematically Fails to Notify Inmate-Detainees That Their Psychotropic Prescriptions Have Been Discontinued or Denied

255. As a matter of policy, practice, and/or custom, Wellpath fails to notify detainees at the Jail regarding any process or procedure for appealing, challenging, or obtaining a waiver to receive their prescribed medications because they were discontinued as "routine" or unable to be verified by Wellpath, causing a de facto denial of their prescribed medical treatment for non-medical reasons.

256. Wellpath systematically fails to communicate its decisions and/or the underlying reasons for discontinuing and/or denying prescription drug treatments to patients under its care.

257. Wellpath systematically fails to notify patients who are denied a prescription medication that there is an adequate appeal or waiver process through which to challenge Wellpath's discontinuation of their prescribed treatments.

258. Wellpaht fails to establish an adequate appeal or waiver process through which to challenge Wellpath's discontinuation of prescribed treatments.

259. Wellpath's policies refuse patients an opportunity to be heard regarding Wellpath's denial of a prescription medication, either before or after the discontinuation of care.

### IV.    CLASS ALLEGATIONS

260.    Plaintiffs bring this action on behalf of themselves and on behalf of all others similarly situated pursuant to Fed. R. Civ. P. 23.

261.    ***Statewide Class*** – Plaintiffs seek to represent a class seeking monetary damages and injunctive relief preliminarily defined as:

> all persons who are, or have been, detained in a county jail or lockup in the State of Michigan which contracts with Wellpath for the provision of medical administration services and upon intake reported a prescribed psychotropic medication to treat a diagnosed, serious mental health care condition but were tortiously denied continuity of prescribed care because of a policy, practice, or custom maintained by Wellpath relating to prescription medications or mental health evaluations, and/or without first receiving a meaningful opportunity to be heard and/or challenge the deprivation of prescribed care.

Plaintiffs reserve the right to amend this class definition and/or add subclasses and/or issue classes (pursuant to Fed. R. Civ. P. 23(c)(4)-(5)) as discovery progresses and the appropriateness of any such classes is determined.

262.    ***Statewide Injunctive Class*** - Plaintiffs seek to represent a class seeking injunctive relief only preliminarily defined as:

> all persons who are, or have been, detained in a county jail or lockup in the State of Michigan which contracts with Wellpath for the provision of medical administration services and upon intake reported a prescribed psychotropic medication to treat a diagnosed, serious mental health care condition but were tortiously denied continuity of prescribed care because of a policy, practice, or custom maintained by Wellpath relating to prescription medications or mental health evaluations, and/or without first receiving a meaningful opportunity to be heard and/or challenge the deprivation of prescribed care.

Plaintiffs reserve the right to amend this class definition and/or add subclasses and/or issue classes (pursuant to Fed. R. Civ. P. 23(c)(4)-(5)) as discovery progresses and the appropriateness of any such classes is determined.

263.    Upon information and belief, every year there are thousands of individuals incarcerated in County Jails in the State of Michigan that contract with Wellpath who report, but

are substantially denied, prescription psychotropic medications to treat serious mental health conditions because of Wellpath's policies, practices, and customs.

264.    While the precise number of Class Members is not presently known, the Class is clearly so numerous that joinder of all members would be impracticable.

265.    This case involves numerous questions of law and fact that are common to Plaintiffs and all members of the putative class. Such questions include, by way of illustration only, and without limitation:

    a.  Whether Plaintiffs and the Class reported a prescription psychotropic medication to Defendant;

    b.  The duty owed to Plaintiffs and the Class by Wellpath;

    c.  Whether Wellpath breached any duties owed to Plaintiffs and the Class;

    d.  Whether the Defendant acted with a deliberate indifference to a known or obvious danger—discontinuation of prescribed psychotropic medications;

    e.  Whether the actions of Wellpath constituted negligence and/or gross negligence, including whether they were so reckless as to demonstrate a substantial lack of concern for whether an injury would result.

    f.  The identity of all putative class members who reported prescription medication to Defendant;

    g.  The specific psychotropic medication(s) reported by each member of the putative class, including whether the prescription medication was administered by Wellpath and its contractors/agents;

    h.  Whether Wellpath administered, discontinued, denied, and/or started prescription psychotropic medication treatments to Plaintiffs and the Class;

    i.  The extent to which Wellpath established policies that caused widespread discontinuity of prescribed care for individuals who reported a prescription psychotropic medication;

    j.  The established policies of Wellpath and whether its conduct caused Plaintiffs and the putative class to be denied continuity of prescribed care;

k.  How Wellpath and its agents utilized the Wellpath formulary to make determinations regarding the discontinuation, denial, and/or start of reported prescription psychotropic medications to patient-detainees under their charge;

l.  How Wellpath and its agents administered and executed the company's medication verification process with respect to decisions to discontinue, deny, or start prescription medications for patient-detainees under their charge;

m.  How Wellpath and its contractors/agents classified drugs by type, class, and/or priority, *inter alia*, and the extent to which that caused discontinuity of care for Plaintiffs and the Class;

n.  Whether Wellpath's policies, practices, and customs with respect to psychotropic medications caused discontinuity of care for Plaintiffs and the Class;

o.  Whether and to what extent Wellpath's policies, practices, and customs provided Plaintiffs and the Class with a meaningful opportunity to challenge determinations regarding the discontinuation, denial, and/or restart of prescribed psychotropic medications;

p.  Whether and to what extent Wellpath and its agents utilized non-medical and/or non-penological considerations with respect to its decisions to discontinue, deny, unreasonably delay, and/or start prescription psychotropic medications for patient-detainees under their charge;

266.  These common questions of law and fact, *inter alia*, predominate over individual questions with respect to each member of the putative class, and a class action is superior to individual litigation under these circumstances.

267.  The claims of the named Plaintiffs are typical of the claims of the absent Class Members.

268.  The manner and process by which named Plaintiffs were harmed is common to those of the Class and they are pursued under the same legal theories as are applicable to the Class.

269.  The putative class is ascertainable from Wellpath's own records and the predominant questions at issue regarding liability can be proven through the same, including intake forms and questionnaires in medical records, medical/mental health screening records, mental

health assessment records, mental health evaluation records, psychiatric evaluation records, medication verification forms, medication administration records, and other documents in Wellpath's possession and control.

270.    Separate adjudications will create a risk of decisions that are inconsistent with or dispositive of other class members' claims.

271.    Declaratory and/or injunctive relief is appropriate under these circumstances based on Wellpath's policies, practices, and customs, which have affected the class generally and likely to affect the Class in the future.

272.    Plaintiffs will fairly and adequately protect the interests of the absent Class Members and have no conflicts with the Class with respect to the allegations in this complaint.

273.    Plaintiffs have retained counsel with substantial experience related to class action claims, including claims that are similar to this lawsuit.

274.    Plaintiffs' Counsel has represented certified classes in numerous cases involving similarly complex issues.

275.    Plaintiffs' Counsel has investigated the allegations in this complaint and has committed the appropriate resources to representing the Class.

276.    This case is appropriate for certification under Rule 23(b)(3). Common issues of fact and law predominate over questions affecting only individual Class Members and a class action is the superior means for litigating this case.

### Count I – 42 U.S.C. §§ 1983 and 1988 – Monell Claim – Fifth/Fourteenth Amendments (as to pre-trial detainees), Monell Claim, Denial of Due Process, Deliberate Indifference to Known Serious Medical Needs

277.    Plaintiffs incorporate by reference the allegations above as if fully set forth herein.

278.     Defendant Wellpath acted under color of state law, carrying out a traditional state function, to deprive Plaintiffs and the putative class of their constitutional rights.

279.     Defendant Wellpath established, implemented, supplemented, reinforced, promulgated, and/or maintained policies, practices, and customs, as set forth above, all of which were the proximate cause and/or moving force in the violation of Plaintiffs Hall, Lafuze, and the putative class' constitutional rights.

280.     Defendant Wellpath established, maintained, and encouraged policies, practices, and customs, as set forth above, with deliberate indifference to the rights of detainees within the custody of the Grand Traverse County Jail, specifically with regard to Plaintiff and the putative class' constitutional right to due process in the form of providing a known prescription psychotropic medication to treat known, serious medical conditions.

281.     Wellpath knowingly acted against a prescribed regimen of care without first requiring an adequate mental health care evaluation.

282.     Defendant Wellpath knew that a substantial risk of serious harm was likely to result from the discontinuation of prescribed psychotropic medications to treat inmate-detainees with known, serious mental health conditions; yet it established, maintained, encouraged, and implemented policies, practices and customs that caused such discontinuity of care.

283.     After learning that such substantial risk of serious harm existed, Defendant failed to take reasonable measures to abate the risk.

284.     As a direct and proximate result of the acts, conduct, and omissions of Defendant, pursuant to established policies, practices, and customs, Plaintiffs and the putative class suffered the following injuries and damages:

     i.      Physical injury;

    ii.     Clinical decompensation;

    iii.    Psychological trauma;

    iv.    Conscious physical and emotional pain, suffering, anguish, distress, and fear;

    v.     Consequential damages;

    vi.    Economic costs associated with the discontinuity of care; and

    vii.   Other damages.

### Count II – 42 U.S.C. §§ 1983 and 1988 – Monell Claim – Eighth Amendment (as to convicted detainees), Cruel and Unusual Punishment, Deliberate Indifference to Known Serious Medical Needs

**285.** Plaintiffs incorporate by reference the allegations above as if fully set forth herein.

**286.** Defendant Wellpath acted under color of state law to deprive Plaintiffs and the putative class of their constitutional rights by carrying on a traditional state function of administering prescription medication care in a County Jail.

**287.** Defendant Wellpath established, implemented, supplemented, reinforced, promulgated, and/or maintained policies, practices, and customs, as set forth above, all of which were the proximate cause and/or moving force in the violation of Plaintiff Lafuze, and the putative class' constitutional rights.

**288.** Defendant Wellpath established, maintained, and encouraged policies, practices, and customs, as set forth above, with deliberate indifference to the rights of detainees within the custody of County Jails, specifically with regard to Plaintiff and the putative class' constitutional right to due process in the form of providing a known prescription psychotropic medication to treat known, serious mental health condition.

**289.** Wellpath knowingly acted against a prescribed regimen of care without first requiring an adequate mental health care evaluation.

290.    Defendant Wellpath knew that a substantial risk of serious harm was likely to result from the discontinuation of prescribed psychotropic medications to treat inmate-detainees with known, serious mental health conditions; yet it established, maintained, encouraged, and implemented policies, practices and customs that caused such discontinuity of care.

291.    After learning that such substantial risk of serious harm existed, Defendant failed to take reasonable measures to abate the risk.

292.    As a direct and proximate result of the acts, conduct, and omissions of Defendant, pursuant to established policies, practices, and customs, Plaintiff and the putative class suffered the following injuries and damages:

i.      Physical injury;

ii.     Clinical decompensation;

iii.    Psychological trauma;

iv.     Conscious physical and emotional pain, suffering, anguish, distress, and fear;

v.      Consequential damages;

vi.     Economic costs associated with the discontinuity of care; and

vii.    Other damages.

## Count III – 42 U.S.C. §§ 1983 and 1988 – Substantive Due Process Violation, State Created Danger

293.    Plaintiffs incorporate by reference the allegations above as if fully set forth herein.

294.    Plaintiffs have a well-established and fundamental right under the Fourteenth Amendment of the United States Constitution to personal security and bodily integrity.

295.    Plaintiffs and the putative class were detained in a custodial setting and subject to Defendant's exclusive control with respect to medical administration and care.

296. Plaintiffs and the putative class entered the custodial setting under an established regimen of psychotropic prescription medication treatment(s) that was essential to their personal security and bodily integrity.

297. Defendant took the intentional, affirmative act of discontinuing, denying, delaying, and/or intentionally and unreasonably disrupting continuity of care to Plaintiffs' and the putative class with respect to known, clinically indicated and community-prescribed psychotropic medications that were essential to their personal security and bodily integrity.

298. Defendant's affirmative acts were knowingly against a prescribed regimen of care without first requiring an adequate mental health care evaluation.

299. Plaintiffs and the putative class were subject to a serious risk of bodily harm and psychological trauma that was not present prior to becoming subject to Defendant's custody, administration, and medical charge.

300. Defendant knew, or clearly should have known, that affirmatively depriving Plaintiffs and the putative class of known, prescription psychotropic medications presented a serious risk of serious bodily harm and psychological trauma to them specifically; yet it discontinued their medications anyway.

301. Plaintiffs and the putative class were specially and directly endangered because they were deprived of medications that were essential to their personal security and bodily integrity.

302. As a direct and proximate result of Defendant affirmative acts, which were made pursuant to its established policies, practices, and customs, Plaintiffs and the putative class suffered the following injuries and damages:

     i.     Physical injury;

ii.      Clinical decompensation;

iii.     Psychological trauma;

iv.    Conscious physical and emotional pain, suffering, anguish, distress, and fear;

v.      Consequential damages;

vi.    Economic costs associated with the discontinuity of care; and

vii.   Other damages.

303.    To the extent that Defendant claims that its acts were pursuant to a legitimate penological interest, such interests are clearly outweighed by the serious harm suffered by Plaintiffs and the putative class, whose physical security and bodily integrity were put at serious risk.

**Count IV – 42 U.S.C. §§ 1983 and 1988 – Fourteenth Amendment, Denial of Procedural Due Process without Meaningful Opportunity to Challenge Determination or be Heard Regarding Deprivation**

304.    Plaintiffs incorporate by reference the allegations above as if fully set forth herein.

305.    Defendant Wellpath acted under color of state law, carrying on a traditional state function, to deprive Plaintiffs and the putative class of their constitutional rights.

306.    Plaintiffs and the putative class have a well-established right to personal security and/or bodily integrity.

307.    Defendant deprived Plaintiffs and the putative class of their clearly established right to personal security and/or bodily integrity when Wellpath established, maintained, and encouraged policies, practices, and customs, as set forth above, which caused the systematic and unreasonable interruption, discontinuation, denial, and/or delay of prescribed psychotropic medications to treat known serious mental health condition(s).

308.     The deprivation of prescribed psychotropic medications to treat diagnosed serious mental health conditions is likely to have serious, even fatal side effects.

309.     Defendant deprived Plaintiffs and the putative class of their right to bodily integrity by discontinuing prescribed psychotropic care before first requiring and conducting a (1) mental health screening; (2) mental health evaluation; and/or (3) psychiatric evaluation.

310.     The decision to deprive Plaintiffs and the putative class of their prescribed psychotropic medications was made without a legitimate medical or penological basis and was not made to protect the safety of Plaintiffs or other inmates.

311.     Plaintiffs were deprived of due process without notice or a meaningful opportunity to be heard.

312.     Defendant failed to notify Plaintiffs and the putative class regarding its decision, or the underlying reasons, to interrupt, discontinue, deny, and/or delay administration of prescribed psychotropic medications to treat known serious mental health condition(s).

313.     Defendant failed to provide Plaintiffs with a meaningful opportunity to challenge decisions to interrupt, discontinue, deny, and/or delay the administration of prescribed psychotropic medications to treat known serious mental health condition(s)—either before or after the deprivation occurred.

314.     As a direct and proximate result of the acts, conduct, and omissions of Defendant, pursuant to established policies, practices, and customs, Plaintiffs and the putative class suffered the following injuries and damages:

i.      Physical injury;

ii.     Clinical decompensation;

iii.    Psychological trauma;

iv.     Conscious physical and emotional pain, suffering, anguish, distress, and fear;

v.      Consequential damages;

vi.     Economic costs associated with the discontinuity of care; and

vii.    Other damages.

315.    To the extent that Defendant claims that its acts were pursuant to a legitimate penological interest, such interests are clearly outweighed by the serious harm suffered by Plaintiffs and the putative class, whose physical security and bodily integrity were put at serious risk.

## Count V – Common Law Negligence and Gross Negligence

316.    Plaintiffs incorporate by reference the allegations above as if fully set forth herein.

317.    Plaintiffs and the putative class are current and former individuals incarcerated in County Jails in the State of Michigan who contract with a private health care administrator, Wellpath.

318.    Plaintiffs and the putative class required their prescription psychotropic medication(s) to treat known, serious medical conditions and avoid grievous physical and psychological trauma, clinical decompensation, and injury that would foreseeably result from discontinuity of care.

319.    Defendant has a special relationship with Plaintiffs and the putative class, as the administrator of prescription medication and mental health care evaluations in at least 25 County Jails throughout the State of Michigan.

320.    Defendant has a duty to Plaintiffs under Michigan Law and its contracts with authorized governmental entities to establish and maintain policies, procedures, and practices to

ensure adequate quality of medical care is provided to incarcerated detainees and inmates under its charge and custody.

321. Defendant has a duty to Plaintiffs under Michigan Law and its contracts with authorized governmental entities to establish and maintain policies and procedures governing the distribution, dispensing, prescribing, and disposing of any controlled substances or prescription medication affecting an inmate.

322. Defendant has a duty to Plaintiffs under Michigan Law and its contracts with authorized governmental entities to establish and maintain written policies, procedures, and practices to ensure that a medical, dental, and mental health screening is performed, and/or integrated into the provision of care, for all inmates by a trained staff member.

323. Defendant has a duty to Plaintiffs under Michigan Law and its contracts with authorized governmental entities to record and/or review all Health Screening information obtained from all inmates, which must include, *inter alia*, an inquiry into the current health problems, medical health problems, types of medications used, mode of medication use, amount of medication used, frequency of medication use, history of medication use, past history of treatment and hospitalization relating to mental disturbances or suicides, and the medical disposition for each inmate.

324. Defendant has a duty to Plaintiffs under Michigan Law and its contracts with authorized governmental entities to establish and maintain written policies, procedures, and practices which require that a health appraisal for each inmate be completed by a trained health care person within 14 days after arrival at the facility.

325.     Defendant has a duty to Plaintiffs under Michigan Law and its contracts with authorized governmental entities to ensure that all health appraisals comply with Mich. Admin. Code R. 791.732(a)–(i).

326.     Defendant has a duty to Plaintiffs and the putative class to establish and maintain policies to ensure that all incoming inmates who demonstrate positive results for a serious mental health condition requiring prescription psychotropic medications receive a mental health evaluation prior to discontinuing known prescription psychotropic medications and to take reasonable steps to allow such inmates to receive bridge medications, including reasonable substitute medications, until such an evaluation occurs.

327.     Where a psychotropic medication is clinically indicated, Defendant has a duty to provide the medication or a reasonable substitute, or otherwise advocate for continuity of care, until such time as an adequate mental health evaluation is conducted by a qualified mental health professional.

328.     Defendant has a duty to Plaintiffs to adequately staff each County Jail with qualified prescribers in order to ensure that continuity of care is maintained with respect to psychotropic medications.

329.     Defendant breached its duty of care to Plaintiffs by establishing policies, procedures, and practices that are designed to, and in fact did, cause discontinuity of care with respect to existing prescription medications to treat known serious medical conditions of detainees and inmates under its charge.

330.     Defendant breached its duty of care to Plaintiffs by failing to establish adequate policies, procedures, and practices to ensure that continuity of care is maintained with respect to

existing prescription medications to treat known serious medical conditions of detainees and inmates under its charge.

331.    Pursuant to its policies, procedures, and practices, Defendant breached its duty of care to Plaintiffs by unreasonably causing the interruption, denial, discontinuation, and/or delay of existing prescription medications to treat known, serious medical conditions to detainees and inmates under its care for non-medical reasons.

332.    Pursuant to its policies, procedures, and practices, Defendant breached its duty of care to Plaintiffs by unreasonably interrupting, denying, discontinuing, and delaying existing prescription medications to treat known, serious medical conditions to detainees and inmates under its care without requiring that its contractors/agents first conduct an adequate mental health care evaluation of detainees and inmates under its charge to determine the clinical necessity of the psychotropic medication(s).

333.    By establishing and/or failing to establish policies, procedures, and practices to ensure continuity of prescription medication treatments until a qualified medical or mental health care professional conducted an adequate mental health evaluation of an inmate, Defendant failed to exercise the duty of ordinary care and diligence, which it owes to Plaintiffs, so that serious injury, clinical deterioration, and/or trauma would not result.

334.    Defendant breached its duty by understaffing County Jails with qualified prescribers, causing unreasonable discontinuity of psychotropic medication treatments.

335.    Defendant breached its duty by failing to establish policies, practices, and/or customs that continued previously prescribed psychotropic medications to inmate-detainees, provided a reasonable substitute for that medication, and/or advocated for continuity of care until

such time as a qualified mental health care provider conducted an adequate mental health evaluation.

336.    As a direct and proximate result of the acts, conduct, and omissions of Defendant, and pursuant to its established policies, practices, and customs, Plaintiffs and the putative class suffered the following injuries and damages:

i.      Physical injury;

ii.     Clinical decompensation;

iii.    Psychological trauma;

iv.     Conscious physical and emotional pain, suffering, anguish, distress, and fear;

v.      Consequential damages;

vi.     Economic costs associated with the discontinuity of care; and

vii.    Other damages

337.    The injuries suffered by Plaintiffs were reasonably foreseeable based on Defendant's actions.

338.    Defendant knew that grievous physical injury, clinical decompensation, and psychological trauma were likely to result from cutting people off of their prescription medications without first conducting an adequate medical appraisal of Plaintiffs' present medical and psychological health conditions; yet Defendant disregarded these known risks and continued to maintain policies that cut Plaintiffs off of their medications anyway.

339.    To the extent that Defendant claims that its breaches of duty were pursuant to a legitimate penological interest, such interests are clearly outweighed by the serious harm suffered by Plaintiffs and the putative class, whose lives and bodily integrity were put at serious risk.

340.   By knowingly maintaining and implementing policies which presented a substantial risk of serious injury, and did in fact cause such injury, Defendant knowingly disregarded the rights Plaintiffs and the putative class, causing injury.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiffs request that the Court grant them:

a.   An order certifying one or more classes pursuant to Fed. R. Civ. P. 23 and designating Plaintiffs' attorneys as Class Counsel;

b.   An order declaring that Defendant violated the constitutional rights of Plaintiffs and the Class;

c.   An order declaring the Defendant liable for each Cause of Action as stated above;

d.   Compensatory damages for the injuries and damages suffered by Plaintiffs and the Class, in an amount fair, just and reasonable and in conformity with the evidence at trial and allowable by state and federal law, including;

    i.   42 U.S.C. § 1983
    ii.   42 U.S.C. § 1988
    iii.   Michigan Common Law

e.   Punitive and exemplary damages against Defendant to the extent allowable by law;

f.   Reasonable attorney's and expert fees and costs pursuant to 42 U.S.C. § 1988(b) and (c);

g.   The costs and disbursements of this action;

h.   Injunctive relief ordering Defendant to cease and/or amend all unconstitutional or illegal acts, omissions, policies, practices, and customs that deprive detainees of their prescribed medications while incarcerated, in a manner not inconsistent with any existing legal or regulatory obligations or any legitimate medical/penological interests;

i.   Consequential damages;

j.   Such other relief as this Court may deem fair and equitable, including but not limited to injunctive relief.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: March 12, 2020                   Respectfully submitted,

**LIDDLE & DUBIN, P.C.**
by: /s/ Matthew Z. Robb
Steven D. Liddle (P45110)
Matthew Z. Robb (P81665)
975 E. Jefferson Avenue
Detroit, Michigan  48207
(313) 392-0025
sliddle@ldclassaction.com
mrobb@ldclassaction.com